FILED
APR 06 2020
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

In the United States District Court
For the Western District of Texas
Austin Division

Randy Lynn Raspberry
Plaintiff

Cause Number: 1:20CV0364LY

V. Lorie Davis, Director,
Texas. Dept. of Criminal Justice,
Correctional Institutions Division

Warden Lofton, Senior Warden,
Alfred Hughes Unit,
Texas Dept. of Criminal Justice

The Religious Land Use and Institutionalized Persons Act of 2000'

American Indian Religious Freedom Act of 1978

Title 42, 1996; Public Health and Welfare law of the United States.

Declaratory Relief Demanded

I. Jurisdiction of the Court

1. Plaintiff brings this law suit pursuant to the RLUIPA of 2000' enforcing the AIRFA of 1978, and United States Law Title 42, 1996 Public Health and Welfare. This Court has jurisdiction under 28 U.S.C. 1331+1343 to hear actions as captioned above. Plaintiff seeks declaratory judgment pursuant to 28 U.S.C., 2201.

(A) Cite: Terry White v. William Stevens et. al., Judge David Ezra Case # 1:16-CV-00059-USDC-WDTX (Austin division).
Case # 2:12-CV-00166-USDC-SDTX, Document 322 filed in TXSD on 01-24-19

## II. Venue

2. The Western District of Texas in Austin is appropriate venue under 28 U.S.C., 1391(b)(2) because the Defendant's main office and records reside there, and plaintiff resides at the Alfred Hughes Unit prison in Gatesville, Texas which is in the Western District of Texas.

## III. Parties

3. The Plaintiff, Randy Lynn Raspberry, was at all times relevant to this action a prisoner incarcerated at the TDCJ, Alfred Hughes Unit, which is located in the Western District of Texas. Plaintiff is an Apache Indian and adheres to Native American Religious practices. Plaintiff is proceeding in this suit Pro-Se.

4. Defendant Lori Davis is the Correctional Institutions Division Director of TDCJ, and can be served at P.O. Box 99, Huntsville, Tx. 77340.

5. Defendant Warden Lofton, is the senior warden of the A. Hughes Unit in Gatesville, TX. where the Plaintiff is being held prisoner. He can be served at the A. Hughes Unit, 3201 FM 929, Gatesville, Tx. 76597.

## IV. Exhaustion of Administrative Remedies

6. Plaintiff seeks injunctive relief to require TDCJ to grant him an exemption from it's male inmate hair grooming

policy so that he may grow his hair long, consistent with Native American Religious beliefs. A case has already been tried to the bench on August 29 to 31 2018. Having considered the pleadings of the parties, evidence, and arguments of counsel, the Court made the following findings of facts and conclusions of law, Granting Plaintiffs Requested Relief.

## V. Factual Allegations

7. Plaintiff will be 62 years old in April of this year.

8. Plaintiff lost his Mother in June of 2019, and wants to be able to see her in the afterlife.

9. It is Plaintiffs deeply held religious belief that he must have long hair upon his death in order to be recognized and taken into eternity by his ancestors.

10. Plaintiffs had never cut his hair before coming to prison.

11. Plaintiff has recieved 7-one year set-offs on his 15 year sentence and has around 6 years left to serve.

12. TDCJ's grooming policy requires all prisoners to have short haircuts except female prisoners.

13. TDCJ allows female guards in male prisons to wear long hair in piled up styles which could easily, and upon information and belief, does allow for the concealment

OF CONTRABAND.

14. TDCJ female guards and male guards are allowed to wear wigs, toupees, and hair pieces that "could" be utilized by prisoners to facilitate escape.

15. The majority of nearly 20,000 TDCJ female prisoners have long hair which TDCJ claims on a male prisoner "could" be used to conceal weapons or contraband, but no concern exists for female prisoners or guards.

16. 39 other state prison systems and the U.S. Federal prison system allows either unrestricted or minor restrictions on long hair for male prisoners.

17. Defendant's denied plaintiff's request to grow his hair long putting him in extreme danger of damnation upon death if he does not have long hair by that time.

18. Defendant's claim that allowing plaintiff to grow long hair would be a safety, security, and sanitation risk.

19. Defendants claim that by policy no means are available for plaintiff to grow long hair.

20. Plaintiff alleges his long hair would pose a lesser security risk than that of TDCJ employees as previously described.


21. Plaintiff alleges his long hair would pose no greater threat than any from female prisoners who per capita have greater numbers of assaults on staff than male prisoners do.

22. TDCJ has never alleged long hair on female prisoners helped facilitate staff assualts, or that it is a security, safety, and sanitation risk.

23. TDCJ has never alleged that employee's various hair possibilites pose any safety or security risks.

24. Defendants offer no least restrictive means that will allow plaintiff to fulfill his obligations to his ancestors upon his death.

25. Defendants do not recognize that male inmates could simply lean forward and ~~run~~ run their fingers or a comb, which TDCJ supplies to all inmates upon request, through long hair when ordered to, to check for contraband as female prisoners are required to do.

26. Defendants do not recognize that plaintiffs long hair could be pulled and tied tightly behind his head to be indistinguishable from short hair for photo identification purposes the same way female prisoners are identified.

27. Defendants do not recognize that plaintiff takes a shower every day to eliminate sanitation problems, as do female prisoners.

28. Defendants do not recognize that the majority of this country's prisons which allow long hair have the same safety, security, and sanitation intrests as TDCJ, but they have still considered allowing long hair the least restrictive means of dealing with similar religious requirements.

29. The Religious Land Use and Institutionalized Person's Act of 2000, (RLUIPA) states that: No government shall impose or implant implement a regulation in a manner that imposes a substantial burden on the religious exercise of a person, unless the government demonstrates that imposition of the burden on that person;
   (A) is in furtherance of a compelling governmental intrest;
   (B) is the least restrictive means of furthering that compelling governmental intrest.

30. The RLUIPA's scope or application includes;
   (A) The substantial burden is imposed in a program or activity that recieves Federal Financial assistant, even if the burden results from a rule of general applicability.
   (B) The substantial burden affects Native Americans.

31. TDCJ recieves funding from the Federal Government which it deposits in its general fund through legislative allotment, and then uses for all programs including



Native American religious programs.

32. The 5th Circuit Court of Appeals and virtually all other Federal Circuit Courts have determined that a grooming policy prohibiting the growth of long hair is a substantial burden for Native American prisoners. See Longoria V. Dretke (TDCJ), 507 F3d 898, 903 (5th Cir. 2007), also, Smith V. Ozmint, 578 F3d 246, 251-52 (4th Cir. 2009); policy requiring prisoners to have closely cropped hair substantially burdening prisoner's exercise of religion.

33. Defendants are being sued in their official capacity as decision makers who have the authority to allow plaintiff to grow his hair long to satisfy his religious requirements to his ancestors while awaiting death.

34. Defendants have not been ordered by any Federal Court to prove its policy denying male prisoners long hair is the least restrictive means of advancing its governmental intrest by actually considering and rejecting the efficacy of less restrictive measures before adopting their challenged practice.

35. Warsolder V. Woodford, 418 F3d 989, 999 (9th Cir. 2005). "Restriction on hair length, with no religious exception, is not the least restrictive means of promoting compelling state intrest in prison security."


36. Defendants have never considered a religious exemption for Native Americans to grow their hair long to satisfy the need for a Native American to commune with his ancestors following death.

37. Plaintiff alleges there is no least restrictive means to satisfy his religious requirement for long hair but to allow its unrestricted growth employing the security process previously outlined.

38. Native American prisoner's religious practices are protected above and beyond other Americans protected by the U.S. Constitution's First Amendment, with various treaties and Acts such as; The American Indian Religious Freedom Act of 1978, (AIRFA)

39. The relevant language of AIRFA states; Whereas, the freedom of religion for all people is an inherent right, fundamental to the democratic structure of the United States and is guaranteed by the First Amendment of the U.S. Constitution... Traditional American Indian ceremonies have been intruded upon, interfered with, and in many instances banned: Now therefore, be it Resolved by the Senate and the House of Representatives of the United States of America in Congress assembled, That henceforth it shall be policy of the United States to preserve for Americans Indians their inherent right of freedom to believe, express, and exercise their traditional religions... including but not limited to access to sites,

use and possession of Sacred objects, and the freedom to worship through ceremonial and traditional Rites

40. Federal Law, Title 42 - The Public Health and Welfare, 1996, states; Protection and Preservation of Traditional Religions of Native Americans: On and after August 11, 1978, it may be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indians...

41. In 1993 Congress enacted the Religious Freedom Restoration Act, and then in 2000' the Religious Land and Institutionalized Persons Act, to specifically address state and Federal violations of Native American and other religions.

42. Plaintiff alleges that the AIRFA and Federal Law, Title 42 1996, gives him the inherent/inalienable right to express his religious beliefs by growing his hair long to await death and acceptence in the afterlife by his ancestors.

43. It is plaintiff's belief that the language of the Federal Act and law cited requires the defendants to accommodate by any means necessary, and with no burdens upon plaintiff, his growth of long hair because Law dictates that Right to be inalienable and that it survives incarceration in all respects.



## V. Causes of Action

Defendants have violated Plaintiff's Constitutional, Federal Act, and Federal Laws, which protect Plaintiff's right to grow his hair long. Plaintiff incorporates paragraphs 1 through 43 as though they were written fully herein.

44. Defendent, Lorie Davis, in her official capacity as Director of TDCJ-Institutional Division, has violated Federal Law, Act, and the First Amendement. of the U.S. Constitution by adhering to and/or implementing policy that denies plaintiff his inalienable right to grow his hair long to satisfy his deeply held religious belief that he is required to have long hair upon his death in order to be accepted in the afterlife by his ancestors.

45. Defendant, Warden Lofton, in her official capacity as Senior Warden of the Alfred Hughes Unit, and the senior TDCJ staff member with complete control over plaintiff, is in violation of Federal Act and Law and the First Amendment of the U.S. Constitution, by not allowing plaintiff's request to grow his hair long in order for him to fullfill his obligations to his ancestors upon his death.

## VI. Additional Factual History

46. John R. Swanton is a Native American Historian and Author of the book; Source Material for the



Social and Ceremonial Life of the Choctaw Indian. Within this book he writes; "Historically all Choctaw men, as well as women, allowed their hair to grow long, hence the tribe were often known as "The Long Hairs."

47. Historically Native American traditions and beliefs have in this country been ridiculed and tred upon by the European Angles who ironicly came to America to flee religious persecution. Once here they quickly determined this country's natives to be savages, and their religious beliefs Pagan, which is a term still used by Federal Judges to describe Native American religious rites and beliefs.

48. Any dictionary definition of the word "Pagan" is as follows; A person who is not Christian, Jew, or Muslim; heathen an irreligious person.

49. This plaintiff alleges that past, present and futher adverse rulings against Native Americans in all Courts is due to the complete lack of Native American Judges of the courts where this type of litigation is heard, and the lack of understanding by all non-native judges of the Native American beliefs, prejudices such litigation to the point that all adverse rulings not only violate Federal Law and Act, they violate the 14th Amendment's Equal Protection Clause, because no ruling has ever been rendered by an equal of the Native American religious beliefs. It's like asking a Muslim Imam to rule



ON Jewish Law.

50. Native Americans have had their free practices of Religion suppressed by every Western Nation that sought to colonize the New world. Throughout history suppressing Native religious practices has been a common practice of those seeking to subjugate a people. It was thought that through denial of a people's own culture they would be easily assimilated into their suppress's culture. France, Britton, Spain and the United States all supressed Native Americans' free practice of Religion and supported, and often funded, efforts to convert Native Americans as a Nation, however, this basic right, guaranteed to all by the Constitution, has been repeatedly denied to Native Americans.

51. The United States continued the policy of the earlier colonial governments by ~~acting~~ actively promoting Christianity to Native Americans. Christian Missionaries were hired as Indian agents, tribal administrative control was often placed in the hands of religious denominations, and tribal-held land was repeatedly given away to organizations that promised to build religious schools or churches on it. I 1869, the Board of Indian Commissioners was established with the intended purpose of educating, Native Americans in the principales of Christianity. I 1879, the Carlisle Indian Industrial School was established in Carlisle, Pennsylvania, by the U.S. Government

for education of Native American children. The School's director, Richard Pratt, stated that his goal was to "kill the Indian and save the man." The school punished children for wearing Native American dress or for speaking their own languages and forbade any practice of the religious traditions.

52. Interior Secretary, Henry M. Teller, holds the distinction of being the first government representative to order official restrictions on the practice of Native American religious customs. In 1802, Director Teller, ordered an end to all "heathenish dances and ceremonies" on reservations due to their "great hindrance to civiliaton." In 1883, Commissioner of Indian Affairs, Hiram Price, codified the practice of officially restricting Native American religious freedom by creating the Indian Religious Crimes Code. In his 1883 annual report to the Secretary of Interior, Price stated:

~~Should~~   "There is no good reason why an Indian should be permitted to indulge in practices which are alike repugnant to common decency and morality; and the preservation of good order on the reservations demands that some active measures should be taken to discourage and, if possible, put a stop to the demoralizing influence of heathenish rites."


53. In 1892, Commissioner of Indian Affairs, Thomas J. Morgan, sought to further suppress Native Religions by ordering penalties of up to six months in prison for those who repeatedly participated in religious dances or acted as medicine men.

54. The Government's attempts to suppress and in many cases out right ban Native American religious practices led to one of the bloodiest events in the history of the United States; The Massacre at Wounded Knee. To enforce the ban on the Ghost Dance in accordance with the Indian Religious Crimes Code, the 7th Calvary was sent into the Lakota Sioux's Pine Ridge and Rosebud Reservations to stop the dance and arrest the participants. General Armstrong Custer's former unit, attacked and killed approxementely 150 Native American men, women and children on December 29, 1890. Charges of killing innocents were brought against members of the 7th Calvary, but all were later exonerated.

55. Defendant's treatment of plaintiff and all Native American prisoners show little has changed, even though they know allowing plaintiff to grow long hair would place zero burdens on TDCJ, they choose to exercise the same predjudices as those throughout the history of this country by making lame, unsubstaniated safety and security claims,



and refuse to reference or consider whether there are other lesser restrictive means to address these issues.

56. Plaintiff alleges that it is no coincidence that most of the states which still do not allow their prisoners to grow their hair long are in the Southern ex-slave states. The slave mentallity still exists in the Southern courts therefore, they are more likely to deny human dignity to prisoners in general, and Native Americans especially simply because that is the way it has always been done there. Untill all courts begin to afford all prisoners dignity to be the humans they were born as, no prisoner will ever be anything but a prisoner, and this plaintiff will be rejected and damned by his ancestors upon his death.

## VII. Prayer for Relief

Wherefore, Plaintiff respectfully prays that this court:

(A.) Declare that the acts and ommissions described herein violated Plaintiff's rights under the Constitution and Federal Laws of the United States.

(B.) Declare that Plaintiff will be allowed to immediately grow his hair long without


restriction, but within TDCJ rules under which female prisoners must abide;

   (C) Order Defendants to pay reasonable attorney fees and costs; and

   (D) Grant other just and equitable relief that this Honorable Court may deem necessary.

On this day _____       _____

                              Mr. Randy Lynn Raspberry
                              #1862821
                              A. Hughes Unit
                              Rt. 2 Box 4400
                              Gatesville, Tx. 76597

### Inmate Declaration

Pursuant to 28 U.S.C. 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 3-9-20          *Randy Lynn Raspberry*
                                              Randy Lynn Raspberry
                                              #1862821